**UNITED STATES** of America and Preston Smith, Warden of United States Correctional Institution at Terminal Island, California, Appellants,

v.

Michele MARCHESE, Appellee.

**UNITED STATES** of America and R. W. May, Warden of United States Correctional Institution at Terminal Island, California, Appellants,

v.

Jesse DEL BONO, Appellee.

Nos. 19172, 19249.

United States Court of Appeals
Ninth Circuit.

Feb. 10, 1965.

Rehearing Denied March 4, 1965.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, Asst. U. S. Atty., Chief,

Crim. Sec., J. Brin Schulman, Asst. U. S. Atty., Los Angeles, Cal., for appellants.

Burton Marks, Beverly Hills, Cal., for appellee Michele Marchese.

Russell E. Parsons, Los Angeles, Cal., for appellee Jesse Del Bono.

Before BARNES, JERTBERG and DUNIWAY, Circuit Judges.

BARNES, Circuit Judge.

### I—*The History.*

The history of this extraordinary combined matter is this:

(1) On June 16, 1958, appellees were each convicted following a jury trial for violation of 18 U.S.C. § 371 and 21 U.S.C. § 174—sale of more than two pounds of heroin.

(2) The judgments of conviction were affirmed by this court *per curiam* on April 15, 1959, 264 F.2d 892.

(3) Petitions for *certiorari* were denied by the United States Supreme Court —Marchese v. United States, 360 U.S. 930, 79 S.Ct. 1447, 3 L.Ed.2d 543 (1959); Del Bono v. United States, 360 U.S. 938, 79 S.Ct. 1463, 3 L.Ed.2d 1550 (1959).

(4) Marchese and then Del Bono filed motions to annul, vacate and set aside their judgments of conviction under the provisions of 28 U.S.C. § 2255 (Marchese, Clk's Tr. p. 98; Del Bono, Clk's Tr. p. 24). Both were denied on December 22, 1960 by the Honorable Thurmond Clarke, the same judge who had tried the appellees earlier. No appeal was taken by either appellee.

(5) On February 3, 1961, each filed motion for reconsideration of the court's order denying the § 2255 motions. On March 14 and 15, 1961, each was again denied.

(6) On June 20, 1961, Marchese filed a petition for a writ of habeas corpus. This was denied by another district court judge, the Honorable Peirson M. Hall. Marchese appealed, and this court affirmed that denial. (304 F.2d 154 (1962).)

(7) Marchese then filed a petition in the United States Supreme Court for a writ of *certiorari.*

(8) Del Bono had meanwhile filed a new motion under 28 U.S.C. § 2255, which was denied by Judge Thurmond Clarke on December 27, 1961. No appeal was taken.

(9) The United States Supreme Court granted Marchese's petition for *certiorari,* and remanded the case to the district court for "reconsideration in the light of Sanders v. United States, 373 U.S. 1 [83 S.Ct. 1068, 10 L.Ed.2d 148]."

### II—*"Sanders v. United States."*

We thus are required first to consider what the Supreme Court meant when it "remanded for reconsideration, in light of Sanders v. United States," supra.

Sanders, when charged with robbing a federally insured bank, declined assistance of counsel, signed a waiver of indictment, pleaded guilty, and was sentenced to imprisonment. When he subsequently filed a § 2255 motion, he charged the indictment was invalid, that he had been denied assistance of counsel, and that he had been coerced into his plea of guilty. This motion *was denied without a hearing,* upon the ground the allegations were conclusionary (i. e., lacked facts upon which conclusions could be based)—although the court added that the files and records showed conclusively that petitioner was entitled to no relief.

Sanders later filed a second § 2255 motion, alleging that at the time of his trial and sentence he had been mentally incompetent as a result of narcotics administered to him while in jail, and alleging specific fact in support of his claim. This second motion was denied without a hearing on the ground that his alleged mental incompetency could have, and should have been raised, at the time of his first motion.

On appeal from the district court's ruling on Sanders' second 2255 motion, this court affirmed in a *per curiam* decision. Sanders v. United States, 297 F.2d 735 (1961). We noted that § 2255 provides that a second or successive motion

for similar relief need not be entertained; that Sanders asked for "similar relief" (to set aside and vacate the sentence) and that § 2255 allowed the trial judge to exercise a reasonable discretion in determining whether Sanders in his first motion could and should not have specified his alleged mental incompetency from use of drugs at the time of his sentence. The Supreme Court noted our reasons for so ruling by quoting from our opinion (373 U.S. 6, 83 S.Ct. 1068). It then reversed this court, holding that the second motion should have been heard.

As we read the Supreme Court's decision, our affirmance of the denial was erroneous because, both at common law and by the very nature of the writ of habeas corpus, res adjudicata is inapplicable to such writs, provided no abusive use of the writ can be demonstrated. Price v. Johnston, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948); Wong Doo v. United States, 265 U.S. 239, 44 S.Ct. 524, 68 L.Ed. 999 (1924). The Supreme Court held that the language "similar relief" used in § 2255 "cannot be taken literally" (373 U.S. 13, 83 S.Ct. 1068), but must be read as the material equivalent of § 2244. This section provides that a judge need not consider a petition for habeas corpus "if it appears that the legality of such detention has been determined * * * on a prior application * * * and the petition presents no new ground not theretofore presented and determined, and the judge or court is satisfied that the ends of justice will not be served by such inquiry." Thus alleging a previously unraised ground for such a writ ordinarily entitles a petitioner to a hearing on such new allegations. Mr. Justice Brennan, in the second part of his opinion in Sanders, lays down certain rules to govern the hearing of § 2255 applications:

(a) Where the second or successive application is shown, on the application, files and records of the case alone, to be conclusively without merit, *the application should be denied without a hearing*.

"Controlling weight may be given to denial of a prior application for federal habeas corpus or § 2255 relief [note] only if (1) *the same ground* presented in the subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application." (373 U.S. at 15, 83 S.Ct. at 1077.) (Emphasis added by this court.)

(b) The court then defines and gives helpful examples of the meaning of the terms "ground," "adjudication on the merits," and "the ends of justice."

(c) It also points out that if a *different* ground is raised, "[n]o matter how many prior applications for federal collateral relief a prisoner has made," it cannot be considered "the same ground," as used in (a) above, but that "if a prisoner deliberately withholds [for example] one of two grounds for federal collateral relief," or abandons his ground, equitable principles require a finding that there exists an abuse of the remedy. Fay v. Noia, 372 U.S. 391 at 438–40, 83 S.Ct. 822, 9 L.Ed.2d 837, and Townsend v. Sain, 372 U.S. 293 at 317, 83 S.Ct. 745, at 9 L.Ed.2d 770 (second case).

(d) And as a final caution, the Court says:

"The principles governing both justifications for denial of a hearing on a successive application are addressed to the sound discretion of the federal trial judges. Theirs is the major responsibility for the just and sound administration of the federal collateral remedies, and theirs must be the judgment as to whether a second or successive application shall be denied without consideration of the merits. Even as to such an application, the federal judge clearly has the power—and, if the ends of justice demand, the duty—to reach the merits." (373 U.S. at 18–19, 83 S.Ct. at 1079.)

Finally, the Court in Sanders ordered the remand, and a hearing of the motion (p. 20, 83 S.Ct. 1068).

There obviously exists a considerable difference of opinion between counsel for the parties before us as to what the Supreme Court did or did not hold with respect to this petitioner's rights.

Appellee Marchese's counsel, in seeking favorable action before Judge Clarke, asserted "that the Supreme Court would not have granted *certiorari* if it had not agreed with at least some, if not all, of the grounds raised in the petition for the writ of habeas corpus." (Marchese v. United States, Clk's Tr. p. 82.) In appellee Marchese's brief before us (with new counsel appearing for him), we are urged to believe:

> "The Supreme Court * * * granted certiorari * * * [and] we submit that the Supreme Court's decision effectively, completely and finally disposes of appellant's contentions herein." (Marchese, Reply Br. p. 8.)

On the other hand, the appellant United States states in its opening brief (p. 4, n. 6), with respect to the granting of *certiorari:*

> "There was nothing in this decision which ordered the district court to grant a hearing to Marchese, or which suggested that the Supreme Court felt there was any merit to the petition * * *. In Sanders * * * the court * * * exempted its decision from those cases * * * 'where the second or successive application is shown * * * conclusively to be without merit. In such a case * * * the application should be denied without a hearing.' "

We cannot completely agree with either position, whether we consider a district court's examination of the "application, files and records of the case '*only*' a hearing," or not a hearing, the Supreme Court remanded the case with a purpose in mind, and we read that purpose as telling this court that there must be a determination by the district court 'of the charges made by petitioner Marchese. We doubt, however, if the Su-

preme Court intended to pass on, or to infer that it intended to pass on, the *merits* of Marchese's charges.

Both sides ask for too much. We conclude the Supreme Court ordered that the appellees herein were entitled to the same kind of *hearing* that Sanders was entitled to: at the minimum, a hearing to determine if there had to be a hearing. We do not understand that it passed on the merits of appellees' positions in any way. Cf.: Habeas Corpus and Post Conviction Review, 33 F.R.D. 363, 478–84.

### III—The Trial Court's Ruling.

We next consider the action taken by the trial court.

On September 30, 1963, Judge Clarke ordered the appellee Marchese's ten-year sentence to be "modified, reduced and corrected to five years," and that Marchese be "immediately released from custody." This judgment and the findings of fact and conclusions of law in support thereof appear in the record (Marchese, Clk's Tr. pp. 172–82). It is from that judgment that this appeal is taken.

On November 12, 1963, Del Bono filed a petition to annul, vacate and set aside and/or modify the judgment of conviction; and on December 18, 1963, Judge Clarke signed a judgment and findings and conclusions ordering relief to Del Bono identical to that granted Marchese. That judgment is likewise the subject of this appeal (Del Bono, Clk's Tr. pp. 34–43).

### IV—Jurisdiction.

Thus, jurisdiction below rests upon 28 U.S.C. §§ 2241, 2243 and 2255. Jurisdiction here exists by reason of 28 U.S.C. §§ 1291, 1294, 2253 and 2255.

Marchese's petition was labeled a "Petition for Writ of Habeas Corpus" (28 U.S.C. § 2243). Del Bono's sought relief under *both* 28 U.S.C. §§ 2243 and 2255. The last paragraph of § 2255, in the opinion of petitioner's counsel (R.T. p. 4, ll. 20–21; p. 9, ll. 5, 6), and of the trial court (Marchese, R.T. pp. 52, 77, 78, 80 81, 93, 122, 125; Del Bono, Clk's Tr. p. 32) and of this court, requires the mo·

tion to be considered as one under § 2255.

We consider both petitions and the joint appeal as one proceeding, in what we hereafter state.

The petitions acted upon by the trial court were not the same. Marchese charged:

(1) The judgment of conviction by use of "silver platter" evidence is in violation of the due process clause.

(2) Petitioner was denied a fair trial because one Donald Sussman conspired and agreed with federal and state authorities to ensnare the petitioner.

(3) The United States Attorney suppressed the truth and failed to disclose the truth concerning this agreement and conspiracy between Sussman and federal and state authorities.

(4) The use of evidence obtained by the electric recording device known as the Schmidt Transmitter was unlawful and violative of the Fourth and Fifth Amendments.

(5) The arrest of petitioner without a warrant, the search of his person and apartment, and of the Del Bono automobile all violated the Fourth Amendment.

(6) The evidence obtained by the interception of an authorized telephone conversation violated the Federal Communications Act, Section 605, Title 47 U.S.C. and the Fifth Amendment.

Del Bono urged only grounds (3) and (4) above.

*V—The Errors Alleged.*

Seven specifications of error are alleged in appellant's brief.[1]

They may be and are summarized by appellant (Br. p. 24) as follows:

(1) The court granted a form of relief which it had no authority to grant, in a case which presented no basis for collateral relief whatsoever; (2) appellees did not sustain their burden of proof required to obtain the limited relief which 28 U.S.C. § 2255 authorizes. We now proceed to examine these alleged grounds of error.

When we refer herein to "T." or "Tr.", we refer to the Clerk's or Reporter's transcript on this appeal (Marchese, No. 19172 or Del Bono, No. 19249); when we refer to *"Trial T."* or *"Orig. Tr.",* we refer to the Clerk's and Reporter's transcript on the original appeal, No. 16151.

*VI—Jurisdiction to Grant Relief Ordered.*

We conclude that the district court order exceeded that court's authority and jurisdiction under 28 U.S.C. § 2255 in two respects.

A. Section 2255 authorizes the district court to do any one of four things: (1) "vacate and set the judgment aside and * * * discharge the prisoner,"

1. "SPECIFICATIONS OF ERROR

"1. The District Court was without jurisdiction to modify and reduce appellees' sentence from ten to five years.

"2. The District Court was without jurisdiction to order the immediate release of appellees from custody based upon 'good time'.

"3. The District Court erred in granting relief upon grounds which were or should have been raised on the direct appeal from appellees' judgments of conviction.

"4. The District Court erred in its Conclusions of Law that (1) it *could* treat the petitions either as for relief under Title 28, United States Code, Section 2255 or Section 2243; (2) That the constitutional rights of petitioners to a fair trial were so denied or infringed up-

on as to amount to a denial of due process.

"5. The District Court erred in its Findings of Fact to the extent that they referred [1] to agreements between narcotics agents and the informant, [2] promises of leniency by the narcotic agents to the informant, [3] suppression of evidence on the part of narcotic agents or by the Assistant United States Attorney, or [4] to denial of the constitutional rights of appellees.

"6. The District Court erred in its refusal to strike appellees' respective petitions from the records of the two cases.

"7. The District Court erred in permitting appellees to claim a Fifth Amendment privilege at the hearings held on their respective petitions."

or (2) "resentence him," or (3) "grant a new trial," or (4) "correct the sentence."

None of the first three courses of action was adopted. It could be maintained that the district court acted under the fourth alternative by correcting appellees' several sentences. But there was no showing that the original sentence was faulty; therefore, no "correction" of the *sentence* was authorized, absent an illegal *conviction*. The sentence was "modified" or "reduced"—and this was done because of alleged trial errors uncovered by the district court. If the court's position is sound that error in fact occurred, of a kind that would justify granting of a § 2255 motion, appellees' sentences should have been entirely vacated and set aside, and the prisoners discharged from the service of any time based on the illegal conviction.

If the court vacates and sets aside the judgment of conviction, then, of course, the prisoner must be discharged, or granted a new trial. If the sentence, as distinguished from the conviction, is illegal, then it may be corrected. But a judge cannot, without vacating the conviction because of a legal defect found therein, change or modify, after Rule 35's sixty day period has expired, a sentence that is itself proper, legal and lawful as a sentence. Richards v. United States, 94 U.S.App. D.C. 85, 212 F.2d 453, 454 (1954), cert. denied 358 U.S. 886, 79 S.Ct. 126, 3 L.Ed. 2d 114; Affronti v. United States, 145 F.2d 3 (8th Cir. 1944).[2]

To reduce a sentence under Rule 35 requires action within a sixty day statutory period. This sixty day period had long expired in each of these cases. Further, no attempt was here made to obtain relief under Rule 35. Rule 36 applies to clerical errors only. This cannot aid appellees.

What the trial court here sought to accomplish was apparently to exercise the equivalent of executive clemency. This he was not authorized or entitled to do. Egan v. United States, 268 F.2d 820 (8th Cir. 1959).

Could it be argued that appellees could petition for a writ of habeas corpus seeking only a reduction of sentence without attacking their conviction or the illegality of their sentence? We think not. Section 2255 "was not meant to broaden the scope of attack upon a judgment and sentence permissible under habeas corpus but rather to confine the relief * * * to the court where sentence was imposed." Crow v. United States, 186 F.2d 704, 706 (9th Cir. 1950). And see: United States v. Murray, 275 U.S. 347, 48 S.Ct. 146, 72 L.Ed. 309 (1928); Richards v. United States, supra.

"It should be observed that the Government's brief suggests that 'while the Court had authority * * * to set aside Appellant's sentence of January 4, 1960, and resentence Appellant, the Court had no authority or power to amend Appellant's sentence.' Manifestly in 1962, when the District Court amended Jenkins' 1960 sentence, the time period, providing for the reduction of a sentence through the exercise of discretion, had passed. [Fed.R.Crim.Proc. 35]. And the statute pertaining to remedies on motions attacking sentence [28 U.S.C. § 2255] does not provide for an amendment of sentence. Rather, it restates and simplifies the ancient writ of error coram nobis so that an erroneous sentence may be vacated or set aside without resort to habeas corpus." Jenkins v. United States, 325 F.2d 942, 945–46 (3d Cir. 1963).

B. The district court likewise exceeded its authority and jurisdiction in finding "that by reason of his [defendant and petitioner] good conduct in custody he has earned such good time as would

**2.** It appears the court below was led into error by the statement unsupported by statute or case law made by appellees' counsel that the court could "order the prisoner discharged for time served." (Marchese, T. 73–77, 128.)

render his immediate release appropriate." (Marchese, Tr. p. 182.)

 The federal prison system is operated in all its aspects by the Attorney General, part of the executive branch of the government, and not by the judiciary. 18 U.S.C. § 4001. Tabor v. Hardwick, 224 F.2d 526 (5th Cir. 1955); Powell v. Hunter, 172 F.2d 330 (10th Cir. 1949).

 "Good time" is a matter for prison authorities, not the courts, except in those extreme cases where the Bureau of Prisons or the Attorney General acts arbitrarily or fraudulently or abuses its authority. Any such finding must be supported by substantial evidence (Lloyd v. Heritage, 199 F.Supp. 46 (N.D.Ga. 1961)), and none was offered or suggested herein.

 The court is without jurisdiction to entertain a "motion of this sort" under 28 U.S.C. § 2255, for that section "merely provides a remedy in the nature of writ of error coram nobis for attacking the judgment and sentence under which a prisoner is incarcerated." Costner v. United States, 180 F.2d 892 (4th Cir. 1960).

We thus hold in two respects the relief granted was erroneous.

### VII—The Limits to Relief That May Be Granted in § 2255 Proceedings.

 Section 2255 cannot take the place of an original appeal. More properly stated, § 2255 may not be invoked to relitigate questions which were or should have been raised on a direct appeal from the judgment of conviction. Dodd v. United States, 321 F.2d 240 (9th Cir. 1963); Black v. United States, 269 F.2d 38 (9th Cir. 1959).

Here there was no opinion by this court from which we can authoritatively determine what was or was not raised on the appeal from the judgment of conviction (or what should have been raised). However, an examination of the appellant's brief, filed with this court by experienced defense counsel on the original appeal (No. 16151) indicates two

points were originally raised—(1) the use of "intercepted" evidence forbidden by 47 U.S.C. § 605 (Communication Act of 1934); and (2) the insufficiency of the evidence to support the jury verdict, with particular reference to the testimony of Sussman, and the fact that he was a user of narcotics, a paid informer, and had received lenient treatment (two years) when sentenced by Judge Byrne. No. 16151, Op.Br. p. 15, ll. 1–4.) Appellee's brief (for the government) in that earlier appeal states:

"The major point of appellants' is that the case is founded upon the testimony of the informant Sussman, and that as such, he is unreliable. This argument was made to the jury, and rejected by it." (Br., p. 12)

Appellants in the earlier appeal then applied for leave to file an additional and supplemental brief, which was allowed by this court. By it, appellants urged as a defense (3) entrapment and (4) the Fifth Amendment "due process" argument with respect to the concealed radio transmitter, alleging it to have constituted a trespass. (Dissenting opinions—On Lee v. United States, 344 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952).)

Thus it might well be argued that appellees are now precluded from again raising under a § 2255 application all the alleged errors herein specified, because each has been heretofore raised on the appeal in chief, determined adversely to appellees by this court (264 F.2d 892), and denied review by the Supreme Court (360 U.S. 930, 938, 79 S.Ct. 1463, 3 L. Ed.2d 1550).

On the possibility, however, that the alleged suppression of evidence by the United States Attorney raises an issue *not* heretofore considered by any appellate court, we consider it necessary to examine that charge. We cannot be certain that the "suppression of evidence" charge was that relied upon by the trial court. We can only assume it may have been.

We have read the transcript of the proceedings below on the hearing of appel-

lees' motions. Government counsel at the hearing repeatedly asked the court to delineate on which of the six grounds urged the petition for relief was to be granted. This the court repeatedly declined to do.

"The Court: I don't feel that that is necessary. I am modifying the judgment. I feel that is all the court is required to do after the order came down from the Supreme Court." (Marchese, Tr. p. 129.)

Despite the court's reluctance to delineate the specific grounds from his grant of relief, we feel the record clearly indicates that the principal and only real issue presented by the evidence related to whether the Assistant United States Attorney suppressed evidence, or knowingly permitted the witness Sussman to lie on the stand. Appellees relied upon evidence of favors granted to Sussman as the substance of their allegations of impropriety and this was the issue which appellant government thought it was required to meet. (Marchese, Tr. p. 95.) The hearing proceeded on this assumption.

We are fortified in this position by the fact the SOLE SPECIFIC finding in the Findings of Fact relating to a lack of fair trial is "the failure" of the Assistant United States Attorney "to disclose to the Court and jury the disposition of the State and Federal cases" against Sussman. (Finding VI; Marchese, Tr. p. 176.)

We thus proceed to examine the validity of the district court order by focusing our attention on the alleged improprieties in the conduct of the Assistant United States Attorney.

### VIII—The Findings.

Turning to the findings here made in the district court, we find:

"I

"That on January 29th, 1958, one Donald Sussman was arrested by Narcotics Agent Malcolm Richards, under a complaint filed by the United States Attorney, wherein he was charged with a violation of Title 21 Sec. 174 U.S.C. and taken to the office of the Bureau of Narcotics in the Federal Building, Los Angeles for a conference with Richards, Howard Chappell, head of the narcotics bureau, and other narcotic agents. That an arrangement was made or some form of promise was given to him by agent Malcolm Richards, the narcotics agent in charge of the investigation of petitioner Michele Marchese, that if he would cooperate in bringing about the arrest and conviction of Marchese, he, Malcolm Richards, would try to obtain some consideration for Sussman.

"That although Malcolm Richards denied any such promise, arrangement or assurance, the Court finds from the evidence that some such promise, arrangement or assurance was in fact made or given to Sussman.

"II

"That after said arrangement made with Sussman, he was taken before the United States Commissioner and released on his O. R. and thereafter worked with the Government as a special employee, unknown as such to Marchese. That he received from the narcotics bureau approximately $600.00 for his services; that Malcolm Richards also contacted and advised Mr. Horton, Chief probation officer of the Los Angeles County Superior Court, of such cooperation and also the Federal Probation Officer.

"III

"That as a consequence of Malcolm Richard's activities aforesaid, the United States Attorney on or about March 26, 1958, dismissed the complaint against Sussman, filed under Section 174 of Title 21, U.S.C. and filed under Section 174 of Title 21, U.S.C. (sic) and filed an information against him under Sections 4704 and 7239 of Title 26, U.S.C., to which Sussman pleaded guilty, waiv-

ing an indictment and was sentenced to two years by U. S. District Judge William B. Byrne for two years only with a recommendation that he be sent to the United States prison hospital at Forth Worth, Texas.

"IV

"That at the time of the trial of Marchese, Sussman testified as follows:

"'Q. As a matter of fact, Mr. Sussman, you actually are using information against these men solely for the purpose of getting a lighter sentence in your case, isn't that true?

"'A. That is correct, one of the reasons.

"'Q. One of the reasons. You knew that if you could give the Government agents some information about anybody the evening that you were arrested, that you would probably be able to get a lighter sentence or perhaps off, isn't that true?

"'A. Probably.'

"V

"That at that time Mr. Sussman had already been granted great leniency, both by the Government and the Superior Court of the County of Los Angeles, and the United States Attorney should then have disclosed to the court and jury what had been done for Mr. Sussman.

"VI

"The agent Malcolm Richards testified at the trial of Michele Marchese as follows:

"'Q. Was anything said by you or anyone in your presence to Mr. Sussman that if he would go to Mr. Marchese's apartment he would—and cooperate with you, that he would receive a lighter sentence on the criminal matter then pending?

"'A. It wasn't said in my presence, if it ever was said.'

That the United States Attorney by a technical objection prevented disclosure of any arrangement between Sussman and Agent Richards in the following manner:

"'Q. Mr. Richards, you say that you first met Mr. Sussman, I believe on the 29th of January, is that right?

"'A. I first met him, yes.

"'Q. Was that as a result of an arrest of some kind?

"'A. Yes, sir.

"'Q. Involving narcotics?

"'A. That is correct.

"'Did you make some kind of an agreement with him?

"'Mr. Bevan: I will object. "Agreement" calls for a conclusion of the witness.

"'The Court: Yes.

"'Mr. Bevan: I have no objection to facts coming out, but—

"'The Court: All right. I will sustain the objection.'

"That at the time Mr. Sussman testified he had already been prosecuted by way of Information and in this Court sentenced to two years in custody of the Attorney General, with a Recommendation of commitment· to the Federal Institution (Hospital For Narcotic Addicts) at Fort Worth, Texas.

"He had not been prosecuted pursuant to Sec. 174 of Title 21 U.S.C. notwithstanding the original complaint charged a violation of such ·section;

"He was permitted to waive indictment, pled guilty and was sentenced by one of the Judges of this Court to two years in custody of the Attorney General of the United States, as just above set forth. The Court finds that Agent Richards, a Federal Bureau of Narcotics agent, assigned to this case had talked with the Chief Probation Office of Los Angeles County concerning Mr. Sussman.

"Mr. Sussman had been convicted of a violation of the California State Narcotics Laws in case No. 179982 in The Superior Court of the State of California, For the County of Los Angeles, June 29th, 1956. He was in violation of Probation. On recommendation of the County Probation Officer of the Superior Court of the State of California, For the County of Los Angeles, on April 30th, 1958, probation was revoked as to Mr. Sussman and the Court terminated the same and Sussman sentenced to one year to run concurrently with the Federal sentence then being served at Fort Worth, Texas, as aforesaid.

"Mr. Sussman did not disclose the above disposition of his cases to the Court and Jury.

"The Court finds that the Federal Narcotics Officers were aware of this disposition, were aware of Sussman's testimony and the failure on his part to disclose this disposition to the Court and Jury.

"The Court further finds that the disposition of the State and Federal cases was known to or should have been known to the Assistant United States Attorney prosecuting the case and the failure to disclose to the Court and Jury the disposition of the State and Federal cases denied Michele Marquese (sic) the fair trial to which he was entitled.

## "VII

"That Sussman was a narcotics addict; that during the period of the investigation of Marchese from January 29th to May 13th, 1959, Sussman was under the influence of narcotics, taking from three to four grams a day and having a shot every 4½ to 5 hours, his habit costing him about $75.00 a day; that he had taken narcotics off the top on sales previously made by him but did not take any off the top on the three occasions involved in this Marchese case; that he took a shot on each oc-casion before he went to the Marchese apartment and took shot before meeting with the narcotic agents on other occasions. That agent Richards and other agents in the investigation knew of Sussman's narcotic record and knew or should have known that he was an addict.

## "VIII

"That Sussman was and had been a friend and acquaintance of Marchese for several years prior to the investigation, and was on friendly terms with Marchese at that time; that on three occasions, to wit, January 30th, January 31st and February 7th, 1958, a Schmidt radio transmitter was concealed on Sussman and he was sent by Agent Richards into the apartment of Marchese at 11032 Moorpark Avenue in North Hollywood, California, while he was there the conversation taking place between Sussman and Marchese was transmitted to the receiving device in the possession of Agent Richards and Deputy Sheriff Farrington of the Los Angeles County Sheriff's Department; that they listened in on such conversations and were permitted over objections of the defense counsel to testify what they overheard taking place in Marchese's apartment; that Marchese was unaware of the existence of such transmitter and of the transmission of the conversations taking place in his apartment, and did not consent thereto.

## "IX

"That on several occasions at the instigation of Agent Richards, Sussman telephoned Marchese at the latter's apartment; that Agent Richards placed his ear as close as possible to the ear piece of the telephone used by Sussman so as to hear the conversation of Marchese; that Agent Richards was permitted over objection by Marchese's counsel to testify what he overheard.

"X

"That Marchese was arrested on March 13th, 1958, without a warrant of arrest; that the Dodge automobile not in possession of Marchese in which narcotics were found and removed by Sussman and Government Agents on the day of the arrest, was searched and the narcotic removed without a search warrant; that following the arrest of Marchese, his apartment was searched without a search warrant, but that no narcotics nor marked or Government money was found in his apartment or on his person.

"XI

"That certain state officers from the Los Angeles County Sheriff's Department participated in the investigation and testified in the case, including Deputy Sheriff Farrington's participation in the use of the Schmidt transmitter aforesaid. * * *"

*Conclusion II*

"That the constitutional rights of petitioner to a fair trial were denied and so infringed upon as to render the judgment subject to collateral attack.

"Rights guaranteed to him under the Fourth and Fifth Amendment to the Constitution were denied him and so infringed upon as to amount to a denial of due process of law in violation of the Fourteenth Amendment to the Constitution of the United States."

*Conclusion III*

"The Court concludes that it would be fair, equitable and just to modify, reduce and correct the sentence to be five years in the custody of the Attorney General of the United States, and it appearing that defendant petitioner has spent in excess of four years in custody of the Attorney General of the United States, and it further appearing that by reason of his good conduct in

custody he has earned such good time as would render his immediate release appropriate. It is further ordered that he be ordered immediately discharged from custody."

We immediately note certain inexactness, uncertainty and some contradictions appearing in the findings of fact, particularly with reference to the one point upon which relief was sought: the proposition that there was a "promise" made by Agent Richards to "stool pigeon" Sussman to cooperate. We point out the following:

1. In Finding I (Marchese, T. 173): "That an arrangement was made *or some form of promise* was given"; (emphasis added) that although denied, "*some such* promise, arrangement or assurance was * * * given. * * *" (Emphasis added.)

2. In Finding III (Marchese, T. 174): that the United States Attorney "dismissed the complaint against Sussman, filed under Sec. 174 of Title 21 U.S.C., and filed under Sec. 174 of Title 21 U.S.C. (sic), and filed an information against him under Sections 4704 and 7239 of Title 26, U.S.C. * * *" We assume this second reference to § 174 of Title 21 U.S.C. was a mere typographical error.

3. In Finding V (Marchese, Tr. 174): that Sussman "had * * * been granted great leniency" without describing it in paragraph V, or referring to paragraph III (if that was what is referred to).

4. In Finding VI: that the United States Attorney by technical objection "prevented disclosure of any arrangement between Sussman and Agent Richards *in the following manner.* * * *" (Emphasis added.) Whereas, the Reporter's Transcript quoted and relied upon fails to disclose any "prevention." To the contrary, the United States Attorney stated: "I have no objection to facts coming out, but. * * *" He was then interrupted by the court, who sustained his objection, and thereafter no attempt was made by defense counsel to elicit from the witness facts, as distin-

guished from the witness' conclusions. (Marchese, T. 175)

5. In Finding VI (Marchese, T. 176): the statement: "Mr. Sussman did not disclose the above disposition of his cases to the Court and jury," when there existed the positive previous finding Mr. Sussman *had* testified as to one case (Marchese, T. 175).

6. That there were no specific findings of fact supporting Conclusion of Law II, second paragraph (respecting the alleged denial of due process law).

7. That it cannot be determined what findings of fact, if any, support the conclusion of law that Marchese was denied due process of law.

8. That there are no conclusions of law specifically or demonstratively founded on—

(a) Finding of Fact VII, relating to Sussman's narcotic addiction;

(b) Finding of Fact VIII, relating to the use of a Schmidt radio transmitter;

(c) Finding of Fact IX, relating to the introduction of overheard telephone conversations;

(d) Finding of Fact X, relating to Marchese's arrest without a warrant, or the search of the Dodge automobile or the search of Marchese's apartment;

(e) Finding of Fact XI, relating to the participation of State officers in the investigation, their testimony at the trial, or their participation in the use of a Schmidt transmitter.

9. That it cannot be ascertained how or in what manner or to what degree, if any, the district court relied upon Findings of Fact VII to XI, inclusive, if at all, in coming to Conclusion of Law II; as to either the first or second paragraphs thereof.

10. That it cannot be ascertained how or in what manner or to what degree, if any, the trial court relied upon Finding of Fact VI in arriving at Conclusion of Law II, second paragraph.

11. That it cannot be ascertained from any findings or conclusions made by the trial court as to the *materiality* of Findings of Fact VII to XI, inclusive, with respect to either paragraph of Conclusion of Law II or of Conclusion of Law III.

12. That it cannot be ascertained from any findings or conclusions made by the trial court as to the *materiality* of Finding of Fact VI with respect to either paragraph of Conclusion of Law II or of Conclusion of Law III.

Federal Rules of Civil Procedure 52(a) requires findings "in all actions tried upon the facts. They are essential to aid the appellate court on review." Irish v. United States, 225 F.2d 3 (9th Cir. 1955); Brooks Bros. v. Brooks Clothing, (S.D.Cal.1945), 5 F.R.D. 14; Welsh Co. v. Strollee, 290 F.2d 509 (9th Cir. 1961).

We must assume fact findings will be made on essential facts only, and not on those which are superfluous or immaterial. But we also require, and are entitled to the benefit of clear and *explicit* findings on any factual issue tried without a jury. 5 Moore 52.06(3) (4) (5), 52.10.

Those before us are deficient in the respect heretofore pointed out.

For that reason it is impossible for this court to determine the materiality of the following Findings of Fact, which are urged here by petitioner below as error, but upon which no conclusions of law are based primarily:

VII—With respect to Sussman's narcotic addiction.

VIII—With respect to the use of the Schmidt radio receiver.

IX—With respect to "overheard telephone conversation."

It could be argued that we must assume that it is for this reason (i. e., their immateriality) that no causal connection is stated or shown between Findings VII, VIII and IX, and any Conclusions of Law. If there is no causal connection such findings should not have been made, and if there was no reliance on such fact findings, explicit reference is likewise required between such findings and any conclusions resting thereon

in order to enable this court to compare the conclusions and findings, and the facts found, with the evidence appearing in the record in our search for "proper findings" to support the ruling.

We find before us but one explicitly related finding of fact to one conclusion of law, i. e., the last paragraph of Finding VI to the first paragraph of Conclusion II.

 We can only conclude the findings are not sufficiently clear to permit us to properly evaluate them, and if for no other reason than this, we would be required to reverse the judgment and remand for further findings and conclusions. However, this does not dispose of the real issue here involved—the alleged suppression of evidence by the government. At the risk of unduly prolonging this opinion, we feel this issue must be discussed.

*IX—The Prosecutor's Suppression or Failure to Disclose the Truth.*

This finding goes to the heart of appellant's position. Under the peculiar circumstances of this matter, we feel obliged to test this one particular finding of fact and the resulting conclusion of law, to determine if the facts in the case are sufficient to support a ruling below that would be within that court's competence and jurisdiction.

The last paragraph of this vital Finding VI is

"that the disposition of the State and Federal cases [against Sussman] was known to or should have been known to the Assistant United States Attorney prosecuting the case and the failure to disclose to the Court and Jury the disposition of the State and Federal cases denied Michele Marquese (sic) the fair trial to which he was entitled."

At the time Sussman testified, the change of the charge against him had already been made by the government. The original indictment charging a violation of § 174, Title 21 U.S.C., had been dismissed, and Sussman was charged with violating §§ 4704 and 7239 of Title 26, U.S.C. (the lesser "tax" penalties) and sentenced on April 30, 1958. His waiver of indictment, plea of guilty and sentence were matters of public record in the same district court in which he testified against Marchese (although before a different judge). It is difficult for us to understand why a matter of public record was required to be brought to the attention of the trial court; but it was—he commented on it (supra).

We thus have three questions before us.

(1) Was the defendant Sussman *in fact* promised leniency or favors for testifying against Marchese by officers or prosecutors?

(2) Did the Assistant United States Attorney know, or should he have known of it?

(3) If both of these questions are answered affirmatively, was the prosecutor under a duty to disclose such facts to the judge and jury?

Question (1) is purely one of fact; question (2) partly fact and partly law; and question (3) one of law, the determination of which usually depends upon facts developed at the trial.

We turn to appellees' (petitioners') charges below:

"3. During the petitioners' trial, the United States Attorney abused the privileges of his office by actively participating in the suppression of the truth and failing to disclose the truth concerning the obvious agreement or understanding between Donald Sussman and the Federal and State authorities, contrary to their oath of office and in disregard of petitioner's constitutional rights under the Fifth Amendment." (Marchese, C.T. 21, et seq.; Del Bono, C.T. 10, et seq.)

We turn to the evidence offered at the hearing in support of Marchese's third ground and Del Bono's first ground, suppression of evidence. We cite in the

**796**

margin first the appellant's résumé of the evidence.[3]

3. "Appellee Marchese called only one witness, former Federal Bureau of Narcotics Agent Malcolm Richards [Marchese, R.T. 9]. Agent Richards specifically denied the existence of any agreement between he (sic) and the informant Sussman, or that he or any other agent had promised Sussman any leniency should he cooperate with the government in any investigation, or that to his knowledge, Sussman had testified other than truthfully at the trial. [Marchese R.T. 13, 24, 36, 37]. The Government called former Assistant United States Attorney Bruce Bevan [Marchese R.T. 58] and Appellee Michele Marchese. [Marchese R.T. 45.] Attorney Bevan similarly denied any knowledge of an 'agreement' between any of the agents and Sussman, or that any agent had promised 'leniency' to Sussman in exchange for his cooperation, or that he had endeavored to suppress evidence at the trial. [Marchese, R.T. 59–60]. Several questions were propounded to Appellee Marchese by Government counsel, relating to the facts of the case. [note] In each instance, upon advice of counsel, appellee refused to answer the questions under claim of the Fifth Amendment privilege against self-incrimination. On each occasion, the court treated the verbal refusal by the appellee as though it were an 'objection' and 'sustained' it without further explanation. Although Government counsel moved to strike the petition based on the effective denial of the Government's right of cross-examination, and, although there was no statement by appellee or his attorney as to the basis for his apprehensiveness, other than the fact that he had previously been prosecuted for perjury, the Government's motion was denied. [Marchese, R.T. 44–48.]

"In the Del Bono case, the situation was quite similar. Moreover, prior to the Del Bono hearing, Government counsel expressed his intention to take the deposition of appellee Del Bono at the Federal Correctional Institution, Terminal Island, California. Appellee's attorney informed the Court and the Government counsel that, because Del Bono had previously been indicted for perjury, he had advised Del Bono to ' * * * avail himself of his privileges and rights under the Fifth Amendment of the Constitution of the United States and refuse to answer any questions.' Upon the acknowl-

We note that appellees charge the statement made in the margin as note 2

edgement of the Court that it would amount to a waste of time, trouble and expense for the Government to so depose appellee, Government counsel advised the court that it would not attempt to take his deposition prior to the hearing. [Del Bono, R.T. 14–16.] At the hearing itself, the same evidence offered at the Marchese hearing was introduced by appellee and no witnesses were called on his behalf.

"Appellant called Appellee Del Bono as a witness. After acknowledging his name and that he had signed the verified petition on page 17 thereof [Del Bono, C.T. 26–27], upon advice of counsel, appellee proceeded to refuse to answer some 17 questions propounded by the Government. [note]

"Counsel for appellants moved to strike the petition and argued the following in support thereof:

" 'Mr. Schulman: I move to strike the petition, your Honor.

" 'Your Honor, this Petition is filed with this court; it is the moving document upon which these proceedings are based. If the witness chooses to bring a petition into this court, then he should be willing to stand cross-examination on that petition or the petition should have no validity before the court. As a unique document, subject to no cross-examination, the witness being subject to no cross-examination, then the proceeding should conclude right now and that pleading should be stricken.'

"The court denied appellant's motion to strike the petition, and sustained appellee's 'objections' as to each question. * * *

"The only basis suggested by appellee's attorney as to why it was believed appellee should claim the Fifth Amendment was that the petition had been * * * 'sworn to in prison before one of the prison officials, and it is here, and I do not believe under the circumstances they are entitled to cross-examine on it', and a subsequent reference to the fact that appellee Del Bono had previously been prosecuted and convicted for perjury. The Court inquired no further into the matter, [Del Bono, R.T. 28–29, 34–36] and did not order the witness to answer any of the questions. [Del Bono, R.T. 36.]" (Appellants' Opening Brief, pp. 17–21.)

"omits essential facts." We therefore place their résumé in the margin,[4] with respect to the "leniency" promised.

We also note the testimony of Bruce Bevan, Esq., the Assistant United States Attorney, using appellees' version of his testimony.[5]

We conclude that there was *no proof* that defendant Sussman was promised "leniency" as such. He *was* promised by

---

4. "That he had been a narcotics agent since 1949; that he and other agents discussed with Sussman what might be done in connection with criminal proceedings against him; that a discussion was had in the office of the Bureau of Narcotics in the Federal Building in Los Angeles; that he was in court when Sussman testified; that prior to Sussman's testifying he discussed with Sussman what, if anything, the government would do for him; that he told Sussman that whatever Sussman did in order to help make a case against his source of supply, they would bring to the attention of the United States Attorney who was handling the case, and in that connection it was up to the United States Attorney, that he, Richards, couldn't promise Sussman anything, that he knew of the proceedings pending against Sussman in the Superior Court of California; that he told Sussman that he would talk to the state officers and see what could be done on Sussman's behalf; that he did talk to the state officers, the Chief Probation Officer, Mr. Holton; that he told Holton that Sussman was aiding the government; that he learned prior to Sussman's testifying that Sussman was sentenced in the Superior Court on April 30, 1958 and that Sussman was given a one-year jail sentence to run concurrently with the sentence (2 years) of the Federal Court; that the 'Karl Holton' signing the probation report, of which a certified copy was introduced (Exhibit 1) and read in evidence (R.T. pp. 17–21), was the same Holton he had talked to; that he knew Sussman pleaded guilty to a tax count and was sentenced to Fort Worth, Texas, by District Court Judge Byrne; that prior to such sentence he talked with the Federal Probation Officer and advised the latter that Sussman was cooperating with the Government.

* * * * *

"That he never promised Sussman that the latter's sentence would be more lenient; that he told Sussman that such was up to the judge, but that he would bring the matter to the attention of the United States Attorney handling the case * * *; that he never told Bruce Bevan, Assistant United States Attorney, that he had any agreement or bargain with Sussman; that he didn't know if Mr. Bevan made an agreement with Sussman; that he never told the Federal Probation Officer to recommend a lighter sentence; that he didn't tell Mr. Holton to make the recommendation made by the latter (Exhibit 1, R.T. pp. 17–21).

* * * * *

"' * * * that he attempted to listen in on certain telephone conversations; that he went to see Mr. Holton, Probation Officer for the County of Los Angeles, to tell of the help and cooperation Sussman intended to give federal agents; that he did not go there to help Sussman necessarily, he did not go to hurt Sussman, and that his going to Holton, would help Sussman; that he did tell Holton that Sussman was aiding the state and federal agents and cooperating with them; that Sussman was helping; that Sussman was paid a total of $600.00.'

ON RECROSS EXAMINATION by the Assistant United States Attorney (R.T. pp. 38–39) Richards testified:

"That the electronics device carried by Sussman on his person at the time of his contacts with Marchese was furnished Sussman as part of the conduct of the Bureau of Narcotics investigation of a criminal case."

5. "That he was the Assistant United States Attorney assigned to the Marchese case; that he never had any conversation with Sussman wherein he promised leniency; that he spoke with Sussman after he had participated in the investigation and after Sussman had been sentenced; that he did not know whether or not any of the agents of the Federal Bureau of Narcotics made any agreement with Sussman or any promises of leniency; that he did not have any intent to suppress evidence; that he had no knowledge that any agreement in fact had actually occurred when he made his objection; that he did not know that Sussman had been arrested in January until Sussman testified at the trial.

* * * * *

"That he tried the Marchese case; that prior to trial he met Richards and other agents and deputy sheriffs, preparing the case; that he discussed the available evidence with Richards on several occasions prior to trial; that he talked with Sussman before the latter went on the stand; that he may have known, at the time, of Sussman's long record of use of narcot-

*Richards*: (a) that whatever Sussman did to aid the prosecution "would be brought to the attention" of the United States Attorney; (b) that Richards, the Federal Bureau of Narcotics agent, told the State probation officer Sussman was "aiding" the federal government, and was giving the federal government "help and cooperation"; that he was "helping," and Bevan, the Assistant United States Attorney did prepare the lesser tax counts for Sussman's plea, and subsequent imprisonment.

"The obvious agreement" charged against the United States Attorney was thus one resting solely on an inference, apparently made by the trial judge, rather than any direct evidence, for there was none to support it.[6]

We pass for the moment the inherent difficulties in proving an "agreement" when the terms thereof have been found to be unknown; and assume, as the court

below did, that there was "*some such promise, arrangement or assurance*" (Finding I) between Richards and Sussman, that Richards "would try to obtain some consideration for Sussman."

This inferred agreement, of course, is not what is charged in Marchese's third ground and Del Bono's first—rather it is that "the United States Attorney [not Richards] abused the privilege of his office * * * by suppressing and failing to disclose the inferred truth."

To best aid appellees' position, we assume questions one and two raised above are answered in the affirmative, and also assume the trial judge could infer an assurance of leniency to a witness by a Federal Bureau of Narcotics employee, with the inferred "cooperation" and knowledge of an Assistant United States Attorney, in return for Sussman's cooperation as a witness in the prosecution of Marchese and Del Bono.

---

ics; that Sussman's record was available and he undoubtedly knew what it was; that he knew prior to the Marchese trial that an information had been filed against Sussman on March 26, 1958, and Sussman had pleaded guilty in case No. 26687 and had been sentenced on a narcotics charge; that he had prepared the information based on a tax count under section 4702(a) and 7237, Title 26 U.S.C.; that Sussman could have been indicted for a more serious offense with the evidence that was available; that prior to the filing of the information he knew Sussman was going to be a witness against Marchese; that prior to Sussman's sentence he probably knew Sussman was under a charge in the state Superior Court; that he did not know whether, at this time, he knew that Richards had talked with the Chief Probation Officer; that at the time of the Marchese trial he knew Sussman had been sentenced to Fort Worth; * * * that he interviewed Sussman but couldn't recall whether it was before the filing of the information or just before the trial; that before he filed the information he had a report from the narcotics officers as to the involvement of Sussman in trafficking in narcotics." (Reply Br. of Marchese, pp. 13–14.)

6. Appellee Marchese repeatedly concedes his conclusions rest upon inference, implications, conjecture and surmise.

(1) "*It may be inferred.*" (p. 36, n. 10(3). Emphasis added.)

(2) His conference with Holton "*caused a recommendation by the Probation Officer.*" (p. 36, n. 10(4). Emphasis added.)

(3) "*[I]t may be inferred*" that Richards made mention of his promise. (p. 37, n. 10(2). Emphasis added.)

(4) Judge Byrne "*must have had such a request to* impose a sentence of extreme leniency, and Judge Clarke *could reasonably have inferred* that such a request or recommendation was made." (Emphasis added.)

(5) Richards' testimony at the hearing is in conflict with his testimony at the trial—at least by implication. (p. 39.)

As appellee Marchese sums up his case:

"In the instant case we can only proceed upon reasonable inference from the facts and rely upon circumstantial evidence to support our contentions."

At best then, Marchese's factual conclusions admittedly rest upon "reasonable inference" and "circumstantial evidence." Yet this weak reed, urges Marchese, renders Richards' answer "perjurious" (p. 39), and makes this case "fall clearly" within the purview of Napue v. Illinois, infra. Powell v. Wiman, infra.

Was such encouragement to Sussman an act which prevented appellees from having a fair trial? Or deprived either of them of a constitutional right, under the facts of this case?

Parenthetically we note that the cooperation of one of several joint defendants in the prosecution of others, in the hope of saving his own skin, is as old as law itself. It seems one part of the unpleasant situation that goes with, and is an integral part of crime, seemingly a necessary part of crime's solution and prosecution and ultimate control, if not prevention. Lisenba v. California, 314 U. S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941), rehearing denied 315 U.S. 826, 62 S.Ct. 620, 86 L.Ed. 1222 (1942); United States v. Vita, 209 F.Supp. 172 (E.D. N.Y.1962).

We turn to the third question under consideration—the prosecutor's duty under the circumstances of this case.

To fairly consider this, we must reconstruct, on the foundation of the evidence produced at the subsequent § 2255 hearings (notes 3, 4, and 5, supra) what occurred at the trial.

Appellee Marchese reaches the primary question of "suppression of evidence" on page 37 of his reply brief.

The Assistant United States Attorney, it is said, "not only was well aware of Sussman's record, and of the state and federal proceedings, and not only failed to disclose same, but by objection prevented their disclosure." The latter part of this statement is simply not supported by the record. We cannot agree with appellee Marchese's counsel that the government's objection "stopped the defense attorneys * * * from inquiring further into any arrangement, agreement, promise, or assurance." (Marchese's Br. p. 37) In truth, Assistant United States Attorney Bevan invited just the opposite —he *invited* defense counsel to go ahead with their questioning. (Tr. p. 175, ll. 20–21.)

We obviously do not question the rule that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." And we concede that rule applies when the State, though not soliciting false evidence, knowingly allows it to go uncorrected when it appears in evidence. Napue v. Illinois, infra at 269, 79 S.Ct. at 1177, 3 L.Ed.2d 1217.

But we find no basis, either in the evidence at the first trial, at the hearing below on this matter, nor in the findings of fact, that would justify a conclusion that a proper "technical" objection to evidence made by the prosecution, sustained by the trial judge, and never again raised by the defendants' counsel, prevented disclosure of any fact. In truth, the exact opposite was shown and found (Tr. p. 175). The government objected only to the witness' conclusion, not to a recital of the facts. The court's ruling sustained the sole objection made on but one ground: that the question called for the witness' conclusion. (Tr. p. 175, ll. 17, 18.)

There is no question but that Sussman knew he could better himself and perhaps obtain leniency if he cooperated with the prosecution. He did not hide his hopes. (Orig. Tr. 419, ll. 1–10.) The court found he did not. (Finding IV.) He testified openly with respect to it at the trial. (Original Tr. pp. 419–22; 433–35; 450.) Government counsel advised court, counsel and the jury of it when making his opening statement (Orig. Tr. pp. 33a–43a). Government counsel so argued to the jury at the end of the case (Orig. R.T. 595). Agent Richards was cross-examined about Sussman's release on his own recognizance, and his sentence by Judge Byrne whereby he received two years imprisonment, a "light sentence." (Orig. T. 95–99.) The trial court commented, as a fact, on Sussman's plea of guilty before Judge Byrne (Orig. T. 99). Richards denied any promise made to Sussman in his (Richards') presence. Both Richards and Assistant United States Attorney Bevan allegedly could not, and did not, *promise* Sussman anything except that

he could continue to hope for leniency and consideration by the judge because of the fact that he had "cooperated." But this is a far cry from a "deal," from a "contract," from a "promise," which appellees *infer* must have existed. Such an inference goes beyond what the record discloses, and there is no competent evidence of any concealment by anyone.

Sussman was cross-examined about his hopes and how he was treated (Orig. T. 412, 419–22; 450; 472–73) and his State arrest (Orig. T. 432–35) and the money paid him by the government to act as an informer (Orig. T. 435–36; 447–48).

Finally, original counsel for Del Bono *inferentially* (Orig. T. 654–55) and original counsel for Marchese *directly* (Orig. T. 670–76) argued to the jury all the facts now urged (save alleged *suppression* of evidence) in an attempt to impeach Sussman.

The evidentiary rule involved is expressed in Wigmore, Vol. III § 967 (3d ed.):

> "It bears against a witness' credibility that he is *an accomplice* in the crime charged and testifies *for the prosecution*, and *the pendency of any indictment* against the witness indicates indirectly a similar possibility of his currying favor by testifying for the State. So, too, the existence of a *promise* or just expectation *of pardon* for his share as accomplice in the crime charged." (Emphasis added.)

The basis for the rule is the general belief that everyone is interested in bettering himself and in saving himself from punishment, and hence that the testimony of such an accomplice testifying with the hope or existing possibility or promise of future benefit or leniency should be carefully tested and weighed and considered by the trier of fact. Cf.: United States v. Masino, 275 F.2d 129 (2d Cir. 1960); Meeks v. United States, 163 F.2d 598 (9th Cir. 1947); United

States v. Hogan, 232 F.2d 905 (3d Cir. 1956).

> "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).

"The determination of the effect of such consideration as a motive for testifying is for the jury." United States v. Bishop, 188 F.Supp. 804 (E.D.Wis. 1960).

We cannot agree with petitioner that the facts of this case bring it within the rule of Napue v. Illinois, supra, or that Powell v. Wiman, 287 F.2d 275 (5 Cir. 1961), is controlling. In the latter case, Hatt, a prosecution witness, had been previously confined in a mental institution. The prosecutor of this Alabama defendant prevented inquiry on part of the defense as to Hatt's insanity. As the court said: "The State doggedly and successfully opposed every effort of the neophyte lawyers to cross examine the witness as to his sanity," when it had evidence, not available to defendant, of the witness' testimony.

In Napue, supra (a murder trial), Hamer, the principal state's witness, then serving a 199 year sentence for the same murder, *was promised* "a recommendation for a reduction of his sentence" already meted out, if he would aid the prosecution of Napue. He then testified, in response to a question by the Assistant United States Attorney, that *he had received no promise* of any consideration in return for his testimony. Nothing was done to correct the witness'

false testimony—known by the prosecution to be false. After trial, the same United States Attorney who had promised Hamer he would recommend a reduction in his sentence filed a petition on Hamer's behalf, detailing his promise to Hamer, and his subsequent assurances to Hamer "that every possible effort would be made to conform to the promise previously made to him." Napue, hearing of this petition, and knowing of Hamer's false testimony at the trial, filed his own petition, and obtained relief. Neither Napue nor Powell v. Wiman, supra, are in point.

We now turn to the fundamental question here presented:

Was there evidence to support the court's inferred conclusion that the Assistant United States Attorney abused his office by suppressing or failing to disclose "the truth" so as to deny appellees a fair trial, and violate their constitutional safeguards?

As we have seen, "the truth" allegedly so suppressed or not disclosed was "the obvious agreement or understanding between Sussman and Federal and State authorities" (Appellees' Br. p. 16), that he (Sussman) should receive leniency. It was not suppressed.

 We find no basis in the record to support any claim that the Assistant United States Attorney suppressed or failed to disclose what Sussman hoped and/or suspected might happen.

The petition attempts to prove the promise by:

(1) Agent Richards' *denial* it existed.

(2) Sussman's admitted *hope or expectation* that he would "probably" get a lighter sentence.

(3) The Assistant United States Attorney's well-taken and court-sustained objection to a question which called for a witness' conclusion.

We hold no one or all of these matters prove an unlawful agreement with or promise to Sussman. And we hold there was no suppression of evidence by the Assistant United States Attorney on the record of this case.

Having determined that the district court erred in *one*, exceeding its jurisdiction in granting unauthorized relief; *two*, making insufficient findings to permit this court to ascertain upon what its conclusions were based; *three*, in holding the evidence in this case supported a finding that an improper agreement existed between the Assistant United States Attorney and the witness Sussman (based entirely on inference); *four*, in finding that the Assistant United States Attorney suppressed evidence (by making a valid objection to the form of a question, sustained by the trial court on that one ground), we hold the findings made are unsupported by the evidence.

Each judgment is reversed, and appellees ordered remanded to custody forthwith.